UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARY LINCOLN, individually and on behalf of all others similarly situated, | § § § | |
| | § | Civil Action No. _____ |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SPECTRA ENERGY CORP., GREGORY L. EBEL, F. ANTHONY COMPER, AUSTIN A. ADAMS, JOSEPH ALVARADO, PAMELA L. CARTER, CLARENCE P. CAZALOT, JR., PETER B. HAMILTON, MIRANDA C. HUBBS, MICHAEL MCSHANE, MICHAEL G. MORRIS, and MICHAEL E.J. PHELPS, | § § § § § § § § | |
| | § | |
| Defendants. | § | |

## CLASS ACTION COMPLAINT

Plaintiff Mary Lincoln ("Plaintiff"), by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

## NATURE OF THE ACTION

1.    Plaintiff brings this class action on behalf of the public shareholders of Spectra Energy Corp. ("Spectra" or the "Company") against Spectra and its Board of Directors (the "Board" of the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") arising out of their attempt to let the Company be acquired by Enbridge, Inc. ("Enbridge") through its wholly owned subsidiary Sand Merger Sub, Inc. ("Merger Sub") by means of an unfair process and for an unfair price.

2.    On September 6, 2016, Spectra and Enbridge announced in a joint press release that they had entered into an Agreement and Plan of Merger dated September 5, 2016 (the

"Merger Agreement").  According to the Merger Agreement, Enbridge would acquire all of the outstanding shares of Spectra common shares in an all-stock transaction (the "Proposed Transaction") for 0.984 of a Enbridge common share per Spectra common share (the "Merger Consideration") for a value of $40.33 per share based on the September 2, 2016 Enbridge closing price of $40.99.

3.     As described in more detail below, given Spectra's recent strong performance, as well as its future growth prospects, the consideration shareholders will receive is inadequate and undervalues the Company.

4.     The Merger Consideration is inadequate in light of the Company's historical performance.  The $40.33 per share implied value of the Merger Consideration represents only an 8% premium over the Company's high closing price of $37.05 on July 15, 2016, less than two months before the Proposed Transaction was announced.  In fact, the Company's stock was continually climbing, and only expected to further increase, making this an opportune time for Enbridge to acquire the Company.  Once the Proposed Transaction is completed, Spectra's shareholders will only own approximately 43 percent of the newly-combined company.

5.     The Board has exacerbated its violations be agreeing to lock up the Merger with deal protection devices that preclude other bidders from making a successful competing offer for the Company.  Specifically, pursuant to the merger agreement dated May 15, 2016 (the "Merger Agreement"), Defendants agreed to: (i) a strict "no-solicitation" provision that prevents the Company from pursuing alternatives to the Merger; (ii) an information rights provision that requires the Company and Parent to promptly, but no less than twenty-four (24) hours, inform the other Party of the material terms of any competing proposal; (iii) a "change of recommendation" provision that requires the Spectra Board to refrain from changing its

recommendation in a manner adverse to Enbridge unless there is a "superior proposal or intervening event" (iv) a "no-waiver" provision restricting the Company and its subsidiaries from terminating, amending, modifying or waiving any material provision of any confidentiality or similar agreement to which Spectra or any of its subsidiaries is a party; and (v) a provision that requires the Company to pay Enbridge a termination fee of $1 billion in order to enter into a transaction with a competing proposal.

6.      To make matters worse, on September 23, 2016, Enbridge filed a Registration Statement on Form F-4 (the "Registration Statement") with the United States Securities and Exchange Commission ("SEC"), which recommends that shareholders vote in favor of the Proposed Transaction.   However, the Registration Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information, thereby rendering the shareholders unable to make an informed decision on whether to approve the Proposed Transaction.   These omissions include, among other things: (i) Spectra and Enbridge's projections, which were utilized by the Company's financial advisors, BMO Nesbitt Burns Inc. (together with BMO Capital Markets Corp. in connection with the fairness opinion, referred to as "BMOCM") and Citigroup Global Markets Inc. ("Citigroup"), in their financial analyses underlying their fairness opinions;  (ii) the valuation analyses prepared by BMOCM and Citigroup in connection with the rendering of their fairness opinions; and (iii) material information concerning the sales process leading up to the Proposed Transaction. Accordingly, Plaintiff alleges herein that Defendants violated Section 14(a) and 20(a) of the 1934 Act in connection with the Proposed Transaction.   Plaintiff seeks to enjoin the Merger unless and until Defendants cure their violations.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction under Section 27 of the 1934 Act (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

8.      The Court has personal jurisdiction over each Defendant because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

**PARTIES**

10.     Plaintiff Mary Lincoln is, and has been at all relevant times, the owner of shares of Spectra common stock.

11.     Defendant Spectra is a corporation organized and existing under the laws of the State of Delaware.  The Company maintains its principal executive offices at 5400 Westheimer Court, Houston, Texas, 77056.  The Company, through its subsidiaries and equity affiliates, owns and operates a large and diversified portfolio of complementary natural gas-related energy assets and is one of North America's leading natural gas infrastructure companies.  The Company also owns and operates a crude oil pipeline system that connects Canadian and U.S.

producers to refineries in the U.S. Rocky Mountain and Midwest regions. The Company's common stock is traded on the NYSE under the ticker symbol "SE."

12.  Defendant Gregory L. Ebel ("Ebel") has been Chairman of the Board, President and Chief Executive Officer ("CEO') of the Company since January 1, 2009. Defendant Ebel is also Chairman, President and Chief Executive Officer of the master limited partnership Spectra Energy Partners, LP ("Spectra Partners"), and the director of the joint venture entity DCP Midstream, LLC ("Midstream").

13.  Defendant F. Anthony Comper ("Comper") has been the Lead Director of the Company since 2014.

14.  Defendant Austin A. Adams ("Adams") has been a director of the Company since 2007.

15.  Defendant Joseph Alvarado ("Alvarado") has been a director of the Company since 2011.

16.  Defendant Pamela L. Carter ("Carter") has been a director of the Company since 2007.

17.  Defendant Clarence P. Cazalot, Jr. ("Cazalot") has been a director of the Company since 2013.

18.  Defendant Peter B. Hamilton ("Hamilton") has been a director of the Company since 2007.

19.  Defendant Miranda C. Hubbs ("Hubbs") has been a director of the Company since 2015.

20.  Defendant Michael McShane ("McShane") has been a director of the Company since 2008.

21.     Defendant Michael G. Morris ("Morris") has been a director of the Company since 2013.

22.     Defendant Michael E.J. Phelps ("Phelps") has been a director of the Company since 2006.

23.     Defendants Ebel, Comper, Adams, Alvarado, Carter, Cazalot, Hamilton. Hubbs, McShane, Morris and Phelps are collectively referred to herein as the "Board" or the "Individual Defendants."

24.     Enbridge is incorporated under the Companies Ordinance of the Northwest Territories and was continued under the Canada Business Corporations Act and the regulations thereunder with its principal executive offices located at 200, 425—1st Street S.W., Calgary, Alberta, Canada, T2P 3L8.  Enbridge, an independent company, focuses on the transportation, distribution and generation of energy, primarily in North America.

25.     Merger Sub is a Delaware corporation and a direct, wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

26.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons that own Spectra common stock (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

27.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class.  As of

September 13, 2016, approximately 701,470,574 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by Spectra or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

28.     Questions of law and fact are common to the Class, including:

(i)     Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(ii)     Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated; and

(iii)    Whether the Class is entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

29.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of the Defendants' wrongful conduct as alleged herein.

30.     Plaintiff will fairly and adequately protect the interests of the Class and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

31.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class, and conflicting adjudications for individual members of the Class might, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Moreover, Defendants have acted or

refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Performance and Growth

32.     Spectra is an independent owner and operator of a large and diversified portfolio of complementary natural gas-related energy assets, as well as a crude oil pipeline system that connects Canadian and United States (U.S.) producers to refineries in the U.S. Rocky Mountain and Midwest regions.  The Company completed its initial public offering on January 3, 2007.

33.     On May 4, 2016, the Company announced its first quarter 2016 financial results for the three months ended March 31, 2016.    For the quarter, ongoing earnings before interest, taxes, depreciation and amortization (EBITDA) were $757 million, compared with $788 million in the first quarter the year prior.  Distributable cash flow (DCF) for the quarter was $523 million, compared with $578 million in the first quarter of 2015.  Ongoing net income from controlling interests was $238 million, or $0.35 diluted earnings per share (EPS), compared with $274 million, or $0.41 diluted EPS in first quarter 2015. Reported net income from controlling interests was $234 million, or $0.35 diluted EPS, compared with $267 million, or $0.40 diluted EPS in first quarter 2015.

34.     Defendant Ebel praised these results, stating, "Spectra Energy's solid first quarter results are very much in line with our full year expectations.  Our businesses generated strong earnings and cash flow despite continued headwinds in the sector.  These results, which illustrate our stable, reliable and disciplined business model, continue to give us confidence in our ability to deliver on the plan we outlined to investors in February.  Spectra Energy benefits from the flexibility of multiple financing options across the corporation.  This allows us to access capital markets at favorable rates and fund our $8 billion of secured expansion projects, as demonstrated

by our recent successful equity raises.  Those expansion projects are advancing as planned, and we continue to make great progress on projects under development.  Most notably, we moved closer to placing Access Northeast – our solution to lower electricity costs and improve electric reliability in New England – into execution."

35.    On June 13, 2016, Spectra announced that its subsidiary, Valley Crossing Pipeline, LLC, has been awarded a 168-mile intrastate natural gas pipeline project by the Comisión Federal de Electricidad (CFE), Mexico's state-owned utility which serves 37 million customers, to provide natural gas transportation services beginning in 2018 to meet Mexico's growing electric generation needs.  Bill Yardley, president of U.S. Transmission and Storage for Spectra, praised this announcement in the press release, stating, "Spectra Energy is pleased to have secured the bid to build and operate this critical infrastructure, which will provide clean-burning and reliable natural gas to support Mexico as its electric generators shift away from fuel oil and imported LNG.  Successfully securing this project adds to our already-strong asset portfolio, connects us to another key demand-pull market, and brings us closer to our goal of securing $35 billion in capital expansion projects by the end of this decade, with approximately $20 billion either in execution or in service since 2013."

36.    On August 3, 2016, the Company announced its second quarter 2016 financial results for the three months ended June 30, 2016.   The Company reported net income of $221 million for the quarter.  EBITDA were $655 million, compared with $652 million in the second quarter the year prior.   Ongoing distributable cash flow for the quarter was $271 million, compared with $285 million in the same quarter the year prior.   Ongoing net income from controlling interests was $169 million, or $0.24 diluted earnings per share, compared with $156 million, or $0.23 diluted earnings per share in second quarter 2015.  Net income from controlling

interests was $149 million, or $0.21 diluted earnings per share, compared with $18 million, or $0.03 diluted earnings per share in second quarter 2015.

37.    Defendant Ebel again praised these results, stating, "Spectra Energy achieved another solid quarter thanks to the strength of our diversified portfolio, and our earnings remain in line with the overall expectations we set at the beginning of the year.  Not only are we making significant progress advancing our projects already in execution, but our project backlog continues to grow, reaching $10 billion this quarter.  Notably, we secured the $1.5 billion Valley Crossing Pipeline project to serve Mexico's developing natural gas market. Our excellent liquidity and investment-grade balance sheet, as well as our access to multiple financing options, continue to be significant competitive advantages.  These advantages, combined with our limited commodity exposure, give us confidence in our ability to deliver on our commitments to our investors."

### The Flawed Sales Process

38.    Despite the Company's recent financial success and strategic moves, the Board conducted a fundamentally flawed sales process.  The Board conducted a single-bidder sales process focused **solely** in favor of a proposed transaction with Enbridge, while securing lucrative benefits for themselves.  Specifically, Defendant Ebel will continue on with the new company, as well as four other members of Spectra's current Board.

39.    Enbridge's senior management has considered or discussed the possibility of a business combination transaction between Enbridge and Spectra periodically for at least the last 18 months.  On May 20, 2016, Mr. Al Monaco, the CEO of Enbridge, called Defendant Ebel to discuss the possibility of combining Enbridge with Spectra and the belief that it was an appropriate time for both companies to consider a possible transaction.

40.     On June 1, 2016, Mr. Monaco and Defendant Ebel, accompanied by each company's Chief Financial Officer and Chief Development Officer, met in Denver, Colorado to further discuss a possible transaction.  At the meeting, Enbridge senior management presented its view regarding the strategic rationale for a transaction between the two companies, including the potential synergies, value drivers and dividend payout assumptions for the combined company. Enbridge senior management also presented its preliminary proposal on the financial parameters of a possible transaction, which included a premium of approximately 10% to the NYSE trading price of Spectra common stock, with approximately 90% of the consideration consisting of Enbridge common shares and the remainder of the consideration consisting of cash.

41.     On June 13 and 14, 2016, the Spectra Board held a regularly scheduled meeting, which was also attended on June 14 by Spectra management and representatives of BMOCM and Wachtell, Lipton, Rosen & Katz (which we refer to as "Wachtell Lipton"), Spectra's outside counsel.  During the meeting, Spectra management and representatives of BMOCM provided a summary of the preliminary discussions between Spectra and Enbridge senior management and the preliminary terms that Enbridge had proposed for a possible combination of the two companies.  The Spectra Board determined that management and Spectra's advisors should continue to engage in discussions with representatives of Enbridge regarding a possible business combination and should report to the Board with updates regarding these discussions.

42.     On June 16, 2016, Defendant Ebel informed Mr. Monaco that the Spectra Board had authorized further discussions regarding a possible combination of Spectra and Enbridge. Defendant Ebel informed Mr. Monaco that the Spectra Board was of the view that the premium and stock/cash consideration mix for Spectra stockholders, dividend growth commitments and

the governance structure of the combined company were important open points requiring further discussion.

43.     On June 17, 2016, Spectra and Enbridge entered into a confidentiality agreement, which included reciprocal standstill restrictions.   Each of Spectra and Enbridge subsequently provided the other party and certain of their respective representatives with due diligence information.   For the remainder of June and throughout July and August, representatives of Spectra and Enbridge engaged in mutual due diligence investigations.

44.     Between June 30, 2016 and July 29, 2016, the respective Spectra and Enbridge management teams and advisors continued to have meetings and conference calls regarding due diligence, regulatory and other matters.   On July 21, 2016, Mr. Monaco called Defendant Ebel to discuss the upcoming meeting of the Enbridge board on July 26 and 27, 2016 and reaffirmed Enbridge's continued interest in assessing a combination of the two companies.

45.     On July 28, 2016, Mr. Monaco called Defendant Ebel to confirm that, consistent with prior discussions, the Enbridge board viewed the combination of the two companies. Defendant Ebel communicated to Mr. Monaco that he and the Spectra Board shared the same favorable view, and that the premium and cash/stock consideration mix for Spectra stockholders, dividend growth commitments and governance structure of the combined company remained open issues that needed to be resolved by the parties.

46.     On July 29, 2016, the Spectra Board held a special meeting during which Defendant Ebel updated the Spectra Board about his conversations with Mr. Monaco regarding a possible transaction and Enbridge's continued interest in combining the two companies. Defendant Ebel also informed the directors that Enbridge indicated that it would submit to Spectra a written non-binding proposal detailing its proposed terms for a possible business

combination.   Following discussion regarding these topics, the Spectra Board indicated its support for management and advisors to continue to engage in discussions with representatives of Enbridge and report back to the Board with updates regarding these discussions.

47.     Following the completion of the Board meeting on July 29, 2016, Defendant Ebel called Mr. Monaco to reiterate that the premium and cash/stock consideration mix for Spectra stockholders, anticipated dividend growth and governance structure of the combined company remained open issues that needed to be resolved by the parties.

48.     Later in the day on July 29, 2016, Enbridge delivered a non-binding proposal letter to Spectra, in which Enbridge proposed a merger with Spectra.  The letter indicated that the combined company would have a 12-member board, with the board Chairman and CEO roles to be split as previously discussed by the parties (with Defendant Ebel becoming the non-executive Chairman of the board of the combined company and Mr. Monaco continuing to serve as the CEO of the combined company), the transaction consideration would consist primarily of stock with a low premium and the combined company would continue to have a major presence in Houston, Texas.   The letter also indicated that Enbridge's review of the proposed transaction suggested that the combined company was expected to be able to deliver annual dividend growth of 10% well into the next decade, while maintaining a conservative payout ratio.

49.     On August 4, 2016, Mr. Monaco and Defendant Ebel discussed the proposed terms contained in Enbridge's proposal letter and Defendant Ebel indicated that, among other things, the premium for Spectra stockholders needed to exceed 10% in order for the transaction to be considered favorably by the Spectra Board.

50.     On August 5, 2016, the respective management teams of Spectra and Enbridge, including the CEOs of each company met, and with the assistance of representatives of Spectra's

financial advisors, BMOCM and Citi, and Enbridge's financial advisors, Credit Suisse and RBC Dominion Securities Inc., ("RBC"), discussed possible transaction terms and certain financial matters, due diligence and value drivers for the combined company, including long term growth prospects and potential synergies.  During this meeting, the Spectra management team and the Enbridge management team discussed, among other things, the premium for the proposed transaction, the consideration mix for Spectra stockholders, the size and composition of the combined company's board, the role and tenure of the chairman of the board of the combined company and matters regarding closing certainty, including the scope of each party's covenants to obtain regulatory approvals.  Spectra management communicated to Enbridge management that, in addition to the resolution of the matters described above, a commitment to dividend growth of at least 10% per year as previously discussed was important to Spectra's willingness to pursue the proposed transaction.

51.    On August 19, 2016, Sullivan & Cromwell LLP ( "Sullivan & Cromwell"), Enbridge's outside U.S. counsel, sent a draft merger agreement to Wachtell Lipton. The draft merger agreement provided for, among other things, a part cash and part stock transaction, generally reciprocal obligations and rights with respect to the ability of each party to change its board recommendation, generally reciprocal termination rights and termination fee triggers, a termination fee of 4% of the transaction's equity value payable by either party in specified circumstances, expense reimbursement if the other party's shareholders voted against the transaction, a prohibition on each party's ability to terminate the merger agreement in order to enter into a superior proposal prior to the completion of the stockholder meetings relating to the transaction, the extent of Enbridge's obligations in connection with obtaining regulatory approvals, an appraisal rights closing condition and a 12-person combined company board,

comprised of four Spectra designees (including Spectra's CEO who would become non-executive Chairman of the Board of the combined company), and eight Enbridge designees (including Enbridge's CEO who would continue to serve as the CEO of the combined company).

52.     On September 1, 2016, representatives of Enbridge sent a revised proposal to Spectra, which provided for an exchange ratio of 0.870 of an Enbridge common share plus $3.82 in cash for each share of Spectra common stock, which represented an approximately 7% premium to the closing price of Spectra common stock on August 31, 2016.  The proposal indicated that the combined cash/stock consideration was equivalent to an exchange ratio of 0.966 of an Enbridge common share for each share of Spectra common stock if it were an all-stock transaction. The proposal also provided for a reciprocal termination fee of 3.85% based on the respective equity values of Spectra and Enbridge, but did not include proposals regarding the size and composition of the combined company's board and committees.

53.     On September 2, 2016, following discussions with Spectra management, representatives of Enbridge sent a revised proposal to Spectra, which provided for an exchange ratio of 0.966 in a stock-for-stock merger, which represented a 9.53% premium to the closing price of Spectra common stock on September 2, 2016.  The proposal also provided for a reciprocal termination fee of 3.85% based on the respective equity values of Spectra and Enbridge, but did not address the size and composition of the combined company's board and committees.  The proposal also indicated that it was subject to rating agency confirmation of Enbridge's current credit ratings, which discussions remained ongoing.

54.     On September 3, 2016, the Spectra Board held a special meeting with Spectra management and representatives of BMOCM, Citi and Wachtell Lipton to receive an update on and review the proposed terms and conditions of a possible transaction with Enbridge, which

was now proposed to be an all-stock merger.  Following discussion, the Spectra Board reiterated its support for the transaction with Enbridge and instructed management to continue negotiations with Enbridge, including to seek an increase of the exchange ratio and improvement of certain of the other terms discussed at this meeting, with another meeting of the Spectra Board to be scheduled after more clarity was received from the rating agencies.

55.    Following the September 3, 2016 Spectra Board meeting, Spectra management sent a revised proposal to Enbridge, which provided for, among other things, an increase in the exchange ratio to 0.988 based on the closing price of Enbridge common shares on the NYSE on September 2, 2016, with an adjustment if the transaction was not to be announced by the opening of business on September 6, 2016 and the price of Enbridge common shares was to decline relative to the price of Spectra common stock, a reduction in the termination fees to 3.5% of the respective equity values of Spectra and Enbridge, Spectra having five designees on the combined company's 13-person board and proportional board committee representation.

56.    During the early morning hours on September 5, 2016, representatives of Sullivan & Cromwell sent a revised draft merger agreement to representatives of Wachtell Lipton, which provided for, among other things, a 0.980 exchange ratio, 3.5% termination fees based on the respective equity values of Spectra and Enbridge and a 13-person combined company board, with five Spectra designees.  Thereafter, the parties and their respective legal advisors continued to negotiate the exchange ratio and finalize the remaining open terms of the draft merger agreement.

57.    By the afternoon of September 5, 2016, the parties agreed to, among other things, submit for consideration by their respective boards of directors the terms of a transaction based on an exchange ratio of 0.984, which represented an implied value per share of Spectra common

stock of $40.33, based on the closing price of Enbridge common shares on the NYSE on September 2, 2016 (the last trading day prior to announcement of the merger), and an approximate 11.5% premium to the closing price of Spectra common stock on the same date.  In addition, the parties agreed to termination fees equal to 3.5% of the respective equity values of Spectra and Enbridge, a 13-person combined company board, with five Spectra designees, proportional representation of the Spectra designees on each board committee and Defendant Ebel becoming the non-executive Chairman of the board of the combined company.  Enbridge management also received and shared with Spectra management favorable feedback from the credit rating agencies regarding their view of Enbridge's credit rating upon the closing of the proposed transaction.

58.     During the evening of September 5, 2016, the Spectra Board held a special meeting at which Spectra management and representatives of BMOCM, Citi and Wachtell Lipton were present.  Spectra management provided an update on the most recent transaction negotiations, including the proposed 0.984 exchange ratio, and management's view that, based on positions taken by Enbridge, this was the maximum exchange ratio that Enbridge would be willing to agree to in the merger.  Based on the discussions and deliberations at the September 3, 2016 and September 5, 2016 board meetings and after receiving Spectra management's favorable recommendation of the merger, the Spectra Board unanimously determined that the merger agreement and the transactions contemplated by the merger agreement were fair to, and in the best interests of, Spectra and its stockholders, approved and declared advisable the merger agreement and the transactions contemplated by the merger agreement, authorized management to execute the merger agreement on behalf of Spectra, directed that the merger agreement be

submitted to a vote at a meeting of Spectra stockholders, resolved to recommend that Spectra stockholders vote to adopt the merger agreement.

59.     Following the approvals by each of the Spectra Board and Enbridge board, Spectra and Enbridge finalized and executed the merger agreement.   On the morning of September 6, 2016, Spectra and Enbridge issued a joint press release announcing the merger agreement.

***The Unfair Merger Agreement***

60.     In a press release dated September 6, 2016, the Company and Enbridge announced that they had entered into the Merger Agreement, dated September 5, 2016, in which Enbridge, through Merger Sub, would acquire the Company in an all-stock transaction for 0.984 of a Enbridge common share per Spectra common share.   The total consideration shareholders will receive, based on Enbridge's closing share price on September 2, 2016, which was the last trading day prior to the announcement of the Merger, would be $40.33 per share.   The joint press release stated, in relevant part:

> Enbridge Inc. (TSX, NYSE:ENB) (Enbridge) and Spectra Energy Corp (NYSE:SE) (Spectra Energy) today announced that they have entered into a definitive merger agreement under which Enbridge and Spectra Energy will combine in a stock-for-stock merger transaction (the "Transaction"), which values Spectra Energy common stock at approximately C$37 billion (US$28 billion), based on the closing price of Enbridge's common shares on September 2, 2016. The combination will create the largest energy infrastructure company in North America and one of the largest globally based on a pro-forma enterprise value of approximately C$165 billion (US$127 billion). The Transaction was unanimously approved by the Boards of Directors of both companies and is expected to close in the first quarter of 2017, subject to shareholder and certain regulatory approvals, and other customary conditions.

> Under the terms of the Transaction, Spectra Energy shareholders will receive 0.984 shares of the combined company for each share of Spectra Energy common stock they own. The consideration to be received by Spectra Energy shareholders is valued at US$40.33 per Spectra Energy share, based on the closing price of Enbridge common shares on September 2, 2016, representing an approximate

11.5 percent premium to the closing price of Spectra Energy common stock on September 2, 2016. Upon completion of the Transaction, Enbridge shareholders are expected to own approximately 57 percent of the combined company and Spectra Energy shareholders are expected to own approximately 43 percent. The combined company will be called Enbridge Inc.

61.     Given Spectra's recent strong performance and its positioning for growth, the Merger consideration is inadequate and significantly undervalues the Company.

62.     Once the Proposed Transaction is completed, Enbridge shareholders will own approximately 57% of the shares of the combined company, and Spectra shareholders will own approximately 43%.

63.     In addition, the Merger Consideration fails to adequately compensate Spectra shareholders for the significant synergies created by the Merger.  The joint press release announcing the Proposed Transaction disclosed the "unparalleled value creation potential" Enbridge will now have as a result of the Proposed Transaction.  Specifically, Greg Ebel, President and CEO of Spectra, stated, "[t]he strength of the combined company will support a large capital program to fund the continued development of Spectra's existing, preeminent project inventory in addition to allowing the combined company to compete for and win the most attractive new growth projects - all while maintaining expected strong dividend growth with exceptional coverage.  The transaction premium recognizes the strength of Spectra's world-class natural gas pipeline system and significant expansion program, while providing shareholders the opportunity to participate in the unparalleled value creation potential of the combined company. While our assets are largely complementary, our values are shared, and together we will create a best-in-class company for shareholders, employees, customers, and communities alike."

*The Unduly Restrictive Deal Protection Devices*

64.     As part of the Merger Agreement, Defendants agreed to certain onerous deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

65.     Section 6.2(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Enbridge.  Section 6.2(a)(ii) demands that the Company terminate any and all prior or on-going discussions with other potential acquirers.  In fact, the Company may not even respond to unsolicited inquiries from potential competing bidders that may lead to a bona fide offer.

66.     Pursuant to § 6.2(c) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must promptly advise Enbridge, but in any event within twenty-four (24) hours, including the material terms and conditions of the proposal and the identity of the party making the competing proposal.

67.     Finally, § 6.2(h) includes a no-waiver provision which restricts the Company and its subsidiaries from terminating, amending, modifying or waiving any material provision of any confidentiality or similar agreement to which Spectra or any of its subsidiaries is a party

68.     The Merger Agreement also provides that a termination fee of $1 billion must be paid to Enbridge by Spectra if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the stockholders with a superior offer.

69.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board

may respond to an unsolicited written bona fide proposal for an alternative transaction that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**The Materially Misleading and Incomplete Registration Statement**

70.     September 23, 2016, Enbridge filed with the SEC a materially deficient Registration Statement which recommended that Spectra shareholders vote in favor of the Proposed Transaction.  In doing so, Defendants have failed to provide complete and accurate information about the Proposed Transaction to Spectra's public stockholders.  This information is necessary to stockholders to make an informed decision about whether to vote their shares in favor of the Proposed Transaction.

71.     The Registration Statement fails to disclose material information relating to the process leading up to the Proposed Transaction.  As set forth in more detail below, the Registration Statement omits and/or misrepresents material information concerning, *inter alia*: (i) Spectra and Enbridge's projections, which were utilized by BMOCM and Citigroup in their financial analyses underlying their fairness opinions; (ii) the valuation analyses prepared by the Company's financial advisor BMOCM in connection with the rendering of their fairness opinion; (iii) the valuation analyses prepared by Enbridge's financial advisor, Citigroup in connection with the rendering of its fairness opinion; and (iv) material information concerning the sales process leading up to the Proposed Transaction.

**Disclosures Relating to the Financial Projections of Spectra and Enbridge Provided to the Board, BMOCM, and Citigroup**

72.     The Registration Statement fails to provide a fair summary of the financial projections of Spectra and Enbridge prepared by their respective management that were provided to and relied upon by BMOCM and Citigroup in performing their financial analyses and which

are necessary for Spectra shareholders to make an informed decision on whether to vote in favor of the Proposed Transaction.  Notably, the Registration Statement fails to disclose the financial projections for Spectra Consolidated as well as its operating segments: (i) Union Gas, (ii) Western Canada, (iii) DCP Midstream, (iv) GP/IDRs and (v) SEP common Units provided by Spectra management and relied upon by BMOCM and Citigroup for purposes of its analysis, for fiscal years 2016-2019, for the following items:

(a)   Revenue

(b)   EBITDA (operating segments only)

(c)   EBIT (or D&A)

(d)   Taxes (or tax rate)

(e)   Cash Taxes

(f)   Dividends (or dividends per share)

(g)   Capital expenditures

(h)   Changes in net working capital

(i)   Any other adjustments to unlevered free cash flow

(j)   Unlevered free cash flow

(k)   Distributable Free cash flow (operating segments only)

(l)   ACFFO

73.   The omission of this information renders the following information misleading:

(a)   On page 82 of the Registration Statement, the table below:

**Summary of Spectra Energy Prospective Financial Information**

The following table presents selected unaudited prospective financial data for the fiscal years ending 2016 through 2019.

| (US$ in millions) | 2016E | 2017E | 2018E | 2019E |
|---|---|---|---|---|
| EBITDA | $2,835 | $3,315 | $3,485 | $3,724 |
| Distributable Cash Flow | $1,318 | $1,594 | $1,878 | $1,792 |

74.     The Registration Statement further fails to disclose the financial projections provided by Enbridge management and relied upon by BMOCM and Citigroup for purposes of its analysis, for fiscal years 2016-2019, for the following items:

(a)     Revenue

(b)     EBITDA

(c)     EBIT (or D&A)

(d)     Taxes (or tax rate)

(e)     Cash Taxes

(f)     Dividends

(g)     Capital expenditures

(h)     Changes in net working capital

(i)     Stock-based compensation expense

(j)     Any other adjustments to unlevered free cash flow

(k)     Unlevered free cash flow

(l)     Distributable Free cash flow (operating segments only)

75.     The omission of this information renders the following information misleading:

(a)     On page 84 of the Registration Statement, the table below:

**Summary of Enbridge Prospective Financial Information**

The following table presents selected unaudited prospective financial data for the fiscal years ending 2016 through 2019.

(C$ in millions)

|  | 2016E | 2017E | 2018E | 2019E |
|---|---|---|---|---|
| Adjusted EBIT | $4,694 | $4,961 | $5,647 | $6,775 |
| ACFFO | $3,751 | $4,027 | $5,027 | $6,005 |

76.     These statements are rendered false and/or misleading by the omissions identified above because without full access to the estimates of Spectra's future cash flows, Company shareholders cannot reliably compare the intrinsic value of the Company to the proposed Merger Consideration offered by Enbridge, and thus cannot determine whether the Proposed Transaction is indeed fair, as Defendants, BMOCM, and Citigroup allege in the Registration Statement. Moreover, these projections form the backbone of the DCF Analysis prepared by BMOCM and Citigroup in their respective fairness opinions.

77.     It is well-settled that management's financial projections are the lifeblood of the Company and are crucial to providing stockholders with management's inside view of the Company's value and future prospects.  Stockholders are entitled to know about the Company's promising future financial prospects before being asked to vote on the Proposed Transaction. This expected performance is more reliable than similar forecasts prepared by third-party analysts and other non-insiders as it comes from members of corporate management who have their fingers on the pulse of the company.  This is particularly true when the stockholders will be cashed out of the Company, because unlike a stock transaction, the stockholders will have no participation in the success of the future combined companies.  Therefore, it is important to know what management and the company's financial advisor's best estimate of those future cash flows would be.  Moreover, such forecasts are material to Plaintiff and other reasonable investors because, in addition to the few line item projections disclosed in the Registration statement,

BMOCM and Citigroup reviewed and relied upon the omitted projections in preparing their fairness opinions.  This data is necessary for making an informed decision about whether to support the Proposed Transaction and, thus, must be disclosed.

***Disclosures Relating to the Financial Opinion of Spectra's Financial Advisor BMOCM***

78.    The Registration Statement discloses certain information regarding BMOCM's financial analyses used to support its fairness opinion. These disclosures concerning BMOCM's financial analyses are materially incomplete and misleading in a number of respects.

79.    The Registration Statement fails to disclose material information concerning BMOCM's *Selected Public Companies Analysis* of Spectra and Enbridge.  Specifically, the Registration Statement fails to disclose the following individual multiples for each of the selected public companies analyzed by BMOCM:

  (a)  EV / CY2016E DCFPS

  (b)  EV / CY2017E DCFPS

  (c)  EV / CY2018E DCFPS

  (d)  EV / CY2016E EBITDA

  (e)  EV / CY2017E EBITDA

  (f)  EV / CY2018E EBITDA

  (g)  EV / CY 2016E Dividends per share

  (h)  EV / CY 2017E Dividends per share

  (i)  EV / CY 2018E Dividends per share

80.    The Registration Statement also fails to disclose whether BMOCM performed any type of benchmarking analysis for either Spectra or Enbridge in relation to the selected public companies.

81.    The omission of this information renders the following information misleading:

(a)     On pages 59-61 of the Registration Statement, the following:

*Selected Public Companies Analyses.* BMOCM performed separate selected public companies analyses of each of Spectra Energy and Enbridge in which BMOCM reviewed certain financial and stock market information relating to Spectra Energy, Enbridge and the following seven companies that BMOCM considered generally relevant as publicly traded companies that directly or indirectly through affiliates own diversified energy infrastructure businesses or assets (which we collectively refer to, together with Spectra Energy and Enbridge, as the "selected companies"):

- Energy Transfer Equity, L.P.
- Enterprise Products Partners L.P.
- Kinder Morgan, Inc.
- ONEOK, Inc.
- Plains All American Pipeline, L.P.
- The Williams Companies, Inc.
- TransCanada Corporation

BMOCM reviewed, among other information, closing stock or unit prices on September 2, 2016 as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated distributable cash flow per share or unit and enterprise values, calculated as implied equity values based on closing stock or unit prices on September 2, 2016, plus total debt, preferred equity and minority interests (as applicable) and less cash and cash equivalents, as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated earnings before interest, taxes, depreciation and amortization (which we refer to as "EBITDA"). BMOCM also reviewed calendar year 2016, calendar year 2017 and calendar year 2018 estimated dividend/distribution yields. Financial data for the selected companies were based on public filings and other publicly available information and, additionally, in the cases of Spectra Energy and Enbridge, the Spectra Energy forecasts and the Enbridge forecasts, respectively.

The overall low to high calendar year 2016, calendar year 2017 and calendar year 2018 estimated distributable cash flow per share or unit multiples, calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples and calendar year 2016, calendar year 2017 and calendar year 2018 estimated dividend/distribution yields observed for the selected companies were as follows:

- calendar year 2016 estimated distributable cash flow per share or unit multiples: 8.9x to 18.5x (with a median of 13.5x)
- calendar year 2017 estimated distributable cash flow per share or unit multiples: 10.2x to 17.4x (with a median of 13.0x)
- calendar year 2018 estimated distributable cash flow per share or unit multiples: 9.5x to 16.8x (with a median of 11.9x)

- calendar year 2016 estimated EBITDA multiples: 12.4x to 15.5x (with a median of 14.7x)

- calendar year 2017 estimated EBITDA multiples: 11.8x to 14.3x (with a median of 13.1x)

- calendar year 2018 estimated EBITDA multiples: 10.6x to 13.7x (with a median of 11.9x)

- calendar year 2016 estimated dividend/distribution yields: 8.8% to 2.3% (with a median of 5.1%)

- calendar year 2017 estimated dividend/distribution yields: 7.7% to 2.3% (with a median of 4.9%)

- calendar year 2018 estimated dividend/distribution yields: 7.7% to 2.7% (with a median of 5.3%)

BMOCM then applied the following selected ranges of calendar year 2016, calendar year 2017 and calendar year 2018 estimated distributable cash flow per share or unit multiples, calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples and calendar year 2016, calendar year 2017 and calendar year 2018 estimated dividend/distribution yields derived from the selected companies to corresponding financial data for Spectra Energy based on the Spectra Energy forecasts and corresponding financial data for Enbridge based on the Enbridge forecasts:

- calendar year 2016 estimated distributable cash flow per share or unit multiples: 13.5x to 18.5x

- calendar year 2017 estimated distributable cash flow per share or unit multiples: 13.0x to 16.1x

- calendar year 2018 estimated distributable cash flow per share or unit multiples: 11.9x to 16.8x

- calendar year 2016 estimated EBITDA multiples: 14.7x to 15.5x

- calendar year 2017 estimated EBITDA multiples: 13.1x to 14.3x

- calendar year 2018 estimated EBITDA multiples: 11.9x to 13.7x

- calendar year 2016 estimated dividend/distribution yields: 5.1% to 3.7%

- calendar year 2017 estimated dividend/distribution yields: 4.9% to 4.0%

- calendar year 2018 estimated dividend/distribution yields: 5.3% to 4.4%

These analyses indicated the following approximate implied per share equity value reference ranges for each of Spectra Energy and Enbridge based on calendar year 2016, calendar year 2017 and calendar year 2018 estimated distributable cash flow per share, calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA and calendar year 2016, calendar year 2017 and calendar year 2018 estimated dividends per share:

- calendar year 2016 estimated distributable cash flow per share: $25.75 to $35.25 (Spectra Energy) and $42.75 to $58.75 (Enbridge)

- calendar year 2017 estimated distributable cash flow per share: $29.00 to $36.00 (Spectra Energy) and $42.75 to $53.00 (Enbridge)

- calendar year 2018 estimated distributable cash flow per share: $30.75 to $43.50 (Spectra Energy) and $45.25 to $64.25 (Enbridge)

- calendar year 2016 estimated EBITDA: $32.50 to $35.75 (Spectra Energy) and $35.50 to $40.00 (Enbridge)

- calendar year 2017 estimated EBITDA: $35.00 to $40.75 (Spectra Energy) and $32.25 to $39.25 (Enbridge)

- calendar year 2018 estimated EBITDA: $32.00 to $41.00 (Spectra Energy) and $32.00 to $43.50 (Enbridge)

- calendar year 2016 estimated dividends per share: $32.50 to $44.50 (Spectra Energy) and $32.00 to $43.75 (Enbridge)

- calendar year 2017 estimated dividends per share: $37.00 to $44.75 (Spectra Energy) and $36.75 to $44.50 (Enbridge)

- calendar year 2018 estimated dividends per share: $37.00 to $44.50 (Spectra Energy) and $37.50 to $45.25 (Enbridge)

Utilizing the approximate implied per share equity value reference ranges derived for Spectra Energy and Enbridge as described above, BMOCM calculated the following implied exchange ratio reference ranges, as compared to the exchange ratio:

Implied Exchange Ratio Reference Ranges Based On:

| CY 2016E DCFPS | CY 2017E DCFPS | CY 2018E DCFPS | CY 2016E EBITDA | CY 2017E EBITDA | CY 2018E EBITDA | CY 2016E Dividends Per Share | CY 2017E Dividends Per Share | CY 2018E Dividends Per Share | Exchange Ratio |
|---|---|---|---|---|---|---|---|---|---|
| 0.438x – 0.825x | 0.547x – 0.842x | 0.479x – 0.961x | 0.813x – 1.007x | 0.892x – 1.264x | 0.736x – 1.281x | 0.743x – 1.391x | 0.831x – 1.218x | 0.818x – 1.187x | 0.984x |

For purposes of this analysis, Union Square analyzed the following statistics for each of the selected comparable companies:

- The enterprise value divided by estimated revenue for calendar year 2016, which is referred to below as Enterprise Value/2016E Revenue; and

- The enterprise value divided by estimated revenue for calendar year 2017, which is referred to below as Enterprise Value/2017E Revenue.

The following table summarizes the mean and median Enterprise Value/Revenue multiples of the selected group of comparable public companies:

| Selected Comparable Public Company Trading Statistics | Mean | Median |
|---|---|---|
| Enterprise Value/2016E Revenue | 3.0x | 2.8x |
| Enterprise Value/2017E Revenue | 2.7x | 2.6x |

Based on the analysis of the relevant metrics for each of the selected comparable companies and upon the application of its professional judgment and expertise, Union Square selected representative ranges of financial multiples and applied these ranges of financial multiples to the relevant financial statistic for Interactive Intelligence.

Based on the number of outstanding shares of Interactive Intelligence common stock on a fully diluted basis (including outstanding options and RSUs) as of July 31, 2016, Union Square calculated the estimated implied value per share of our common stock as follows:

| Financial Statistic | Selected Comparable Companies Representative Multiple Range | Implied Value Per Share of Interactive Intelligence Common Stock |
|---|---|---|
| Enterprise Value/2016E Revenue (Management Case) | 2.0x - 3.0x | $38.48 - $56.12 |
| Enterprise Value/2017E Revenue (Management Case) | 1.75x - 2.75x | $36.90 - $56.17 |
| Enterprise Value/2016E Revenue (Wall Street Case) | 2.0x - 3.0x | $38.46 - $56.10 |
| Enterprise Value/2017E Revenue (Wall Street Case) | 1.75x - 2.75x | $37.50 - $57.11 |

Union Square noted that the consideration to be received by holders of shares of Interactive Intelligence common stock (other than excluded shares) pursuant to the merger agreement was $60.50 per share.

No company utilized in the comparable public company trading analysis is identical to Interactive Intelligence. In evaluating the selected comparable companies, Union Square made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Interactive Intelligence, such as the impact of competition on Interactive Intelligence's businesses and the industry generally, industry growth and the absence of any adverse material change in Interactive Intelligence's financial condition and prospects or the industry or in the financial markets in general. Mathematical analysis (such as determining the average or median) is not in itself a meaningful method of using comparable company data.

82.    The omission of the information identified above renders this section of the Registration Statement materially misleading because shareholders have no way of determining whether the selected range of multiples applied by BMOCM have a valid basis and are reasonable in light of the fact they fall outside the range of multiples (or outside the median range) for the comparable companies.

83.    Further, the Registration Statement fails to disclose material information concerning BMOCM's *Discounted Cash Flow Analysis*. Specifically, the Registration Statement

fails to disclose: (i) the definition of unlevered free cash flow ("UFCF") utilized by BMOCM in its analysis; and (ii) what the implied perpetuity growth rate range is resulting from this analysis.

84.    The omission of this information renders the following information misleading:

(a)    On pages 61-62 of the Registration Statement, the following:

*Discounted Cash Flow Analyses*. BMOCM performed separate discounted cash flow analyses of Spectra Energy and Enbridge by calculating the estimated present value of the standalone estimated, after-tax free cash flows that Spectra Energy and Enbridge were forecasted to generate during the calendar year ending

December 31, 2017 through the calendar year ending December 31, 2019 based on, in the case of Spectra Energy, the Spectra Energy forecasts, and, in the case of Enbridge, the Enbridge forecasts. BMOCM calculated terminal values for Spectra Energy and Enbridge by applying to Spectra Energy's and Enbridge's respective estimated EBITDA for the calendar year ending December 31, 2019 a selected range of EBITDA terminal multiples of 13.5x to 14.5x. The present values (as of December 31, 2016) of the cash flows and terminal values were then calculated using a selected range of discount rates of 5% to 7%. These analyses indicated approximate implied per share equity value reference ranges for Spectra Energy and Enbridge, when discounted from December 31, 2016 to September 2, 2016 and after taking into account the present value of Spectra Energy's and Enbridge's respective tax attributes utilizing a discount rate based on a selected cost of equity of 8.75%, of $28.50 to $36.25 and $43.00 to $54.50, respectively.

Utilizing the approximate implied per share equity value reference ranges derived for Spectra Energy and Enbridge described above, BMOCM calculated the following implied exchange ratio reference range, as compared to the exchange ratio:

| Implied Exchange Ratio Reference Range | Exchange Ratio |
|---|---|
| 0.523x – 0.843x | 0.984x |

85.    These statements are rendered false and/or misleading by the omissions identified above for a variety of reasons.  First, the definition of UFCF can impact the valuation resulting from a DCF analysis.  Second, the implied perpetuity growth rate range from BMOCM's analysis could have a meaningful impact on the conclusions presented in its DCF Analysis.

***Disclosures Relating to the Financial Opinion of Spectra's Financial Advisor Citigroup***

86.    The Registration Statement discloses certain information regarding Citigroup's financial analyses used to support its fairness opinion.  These disclosures concerning Citigroup's financial analyses are materially incomplete and misleading because they fail to disclose certain key data and inputs underlying the financial analyses relied upon by Citigroup in rendering its fairness opinion.

87.     The Registration Statement fails to disclose material information concerning Citigroup's *Selected Public Companies Analyses.*  Specifically, the Registration Statement fails to disclose the following individual multiples for each of the selected public companies analyzed by Citigroup:

(a)     EV / CY2016E EBITDA

(b)     EV / CY2017E EBITDA

(c)     EV / CY2018E EBITDA

(d)     EV / CY2016E cash available for dividends per share

(e)     EV / CY2017E cash available for dividends per share

(f)     EV / CY2018E cash available for dividends per share

(g)     CY 2016E dividend yield

(h)     CY 2017E dividend yield

(i)     CY 2018E dividend yield

88.     The Registration Statement also fails to disclose whether Citigroup performed any type of benchmarking analysis for either Spectra or Enbridge in relation to the selected public companies.

89.     The omission of this information renders the following information misleading:

(a)     On pages 69-76 of the Registration Statement, the following:

*Selected Public Companies Analyses.* Citi performed separate selected public companies analyses of Spectra Energy both on a consolidated and sum-of-the-parts basis and Enbridge on a consolidated basis in which Citi reviewed certain financial and stock market information relating to Spectra Energy, Enbridge and the selected publicly traded companies listed below.

In its selected public companies analysis of Spectra Energy on a consolidated basis, Citi reviewed certain financial and stock market information relating to Spectra Energy and the following eight selected companies that Citi considered generally relevant as publicly traded companies that directly or indirectly through affiliates own diversified midstream energy operations (which we refer to as the "Spectra Energy selected midstream companies"):

- Enbridge Inc.
- Energy Transfer Equity, L.P.
- Enterprise Products Partners L.P.
- Kinder Morgan, Inc.
- ONEOK, Inc.
- Plains All American Pipeline, L.P.
- The Williams Companies, Inc.
- TransCanada Corporation

Citi reviewed, among other information, enterprise values, calculated as implied equity values based on closing stock or unit prices on September 2, 2016, plus consolidated total debt, preferred equity and minority interests (as applicable) and less consolidated cash and cash equivalents, as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA and closing stock or unit prices on September 2, 2016 as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated after-tax cash available for dividends per share or unit. Citi also reviewed calendar year 2016, calendar year 2017 and calendar year 2018 estimated dividend yields. Financial data of the Spectra Energy selected midstream companies were based on publicly available Wall Street research analysts' consensus estimates, public filings and other publicly available information (with observed median multiples and dividend yields inclusive of publicly available Wall Street research analysts' consensus estimates for Spectra Energy and observed low and median dividend yields exclusive of Kinder Morgan, Inc. and The Williams Companies, Inc.). Financial data of Spectra Energy was based on publicly available Wall Street research analysts' consensus estimates and the Spectra Energy forecasts.

The overall low to high calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples, estimated after-tax cash available for dividends per share or unit multiples and estimated dividend yields observed for the Spectra Energy selected midstream companies were as follows:

- calendar year 2016 estimated EBITDA multiple: 12.3x to 15.6x (with a median of 14.5x)
- calendar year 2017 estimated EBITDA multiple: 12.0x to 14.4x (with a median of 13.1x)

- calendar year 2018 estimated EBITDA multiple: 10.8x to 13.7x (with a median of 12.0x)

- calendar year 2016 estimated cash available for dividends per share or unit multiple: 10.9x to 14.9x (with a median of 13.0x)

- calendar year 2017 estimated cash available for dividends per share or unit multiple: 10.1x to 14.3x (with a median of 12.2x)

- calendar year 2018 estimated cash available for dividends per share or unit multiple: 9.3x to 17.0x (with a median of 11.4x)

- calendar year 2016 estimated dividend yields: 3.8% to 7.7% (with a median of 5.1%)

- calendar year 2017 estimated dividend yields: 4.2% to 7.7% (with a median of 5.1%)

- calendar year 2018 estimated dividend yields: 4.6% to 7.7% (with a median of 5.3%)

Citi noted that the calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples for Spectra Energy were 15.3x, 13.3x and 12.3x, respectively, the calendar year 2016, calendar year 2017 and calendar year 2018 estimated cash available for dividends per share multiples for Spectra Energy were 18.5x, 16.1x and 16.8x, respectively, and the calendar year 2016, calendar year 2017 and calendar year 2018 estimated dividend yields for Spectra Energy were 4.5%, 4.9% and 5.3%, respectively, in each case based on publicly available Wall Street research analysts' consensus estimates. Citi then applied the following selected ranges of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples, estimated cash available for dividends per share multiples and estimated dividend yields derived from the Spectra Energy selected midstream companies to corresponding data of Spectra Energy based on the Spectra Energy forecasts:

- calendar year 2016 estimated EBITDA multiple: 14.5x to 15.6x

- calendar year 2017 estimated EBITDA multiple: 13.1x to 14.4x

- calendar year 2018 estimated EBITDA multiple: 12.0x to 13.7x

- calendar year 2016 estimated cash available for dividends per share multiple: 13.0x to 18.5x

- calendar year 2017 estimated cash available for dividends per share multiple: 12.2x to 16.1x

- calendar year 2018 estimated cash available for dividends per share multiple: 11.4x to 17.0x

- calendar year 2016 estimated dividend yields: 5.1% to 3.8%

- calendar year 2017 estimated dividend yields: 5.1% to 4.2%

- calendar year 2016 estimated dividend yields: 5.1% to 3.8%

- calendar year 2017 estimated dividend yields: 5.1% to 4.2%

- calendar year 2018 estimated dividend yields: 5.3% to 4.6%

This analysis indicated an average selected approximate implied per share equity value reference range for Spectra Energy of $32.50 to $41.00.

Citi also performed a sum-of-the-parts analysis of Spectra Energy to observe an approximate implied overall per share equity value reference range for Spectra Energy based on approximate implied values for Union Gas, Spectra Energy's Western Canada Transmission & Processing business (which we refer to as "Western Canada"), Spectra Energy's 50% equity interest in DCP Midstream, LLC (which we refer to as "DCP Midstream"), Spectra Energy's general partner interests and related incentive distribution rights (which we collectively refer to as "GP/IDRs") in Spectra Energy Partners, and Spectra Energy Partners common units representing limited partner interests (which we refer to as "SEP common units") owned by Spectra Energy.

In evaluating Union Gas, Citi reviewed certain financial and stock market information, as applicable, relating to Union Gas and the following 12 selected companies that Citi considered generally relevant as publicly

traded companies that are U.S. local distribution and Canadian utility companies (which we refer to as the "Spectra Energy selected gas distribution companies"):

- Atmos Energy Corporation
- Emera Incorporated
- Fortis Inc.
- Hydro One Limited
- New Jersey Resources Corporation
- NiSource Inc.
- Northwest Natural Gas Company
- ONE Gas, Inc.
- South Jersey Industries, Inc.
- Southwest Gas Corporation
- Spire Inc.
- WGL Holdings, Inc.

Citi reviewed, among other information, enterprise values as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA. Financial data of the Spectra Energy selected gas distribution companies were based on publicly available Wall Street research analysts' consensus estimates, public filings and other publicly available information. Financial data of Union Gas was based on the Spectra Energy forecasts.

The overall low to high calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples observed for the Spectra Energy selected gas distribution companies were 8.2x to 17.1x (with a median of 11.2x), 7.8x to 12.5x (with a median of 10.6x) and 7.5x to 11.7x (with a median of 9.8x), respectively. Citi then applied selected ranges of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples derived from the Spectra Energy selected gas distribution companies of 11.2x to 12.9x, 10.6x to 12.2x and 9.8x to 11.7x, respectively, to corresponding data of Union Gas based on the Spectra Energy forecasts. This analysis indicated a selected approximate implied value reference range for Union Gas of $5.48 billion to $6.36 billion.

In evaluating Western Canada, Citi reviewed certain financial and stock market information, as applicable, relating to Western Canada and the following six selected companies that Citi considered generally relevant as publicly traded Canadian companies with operations in the diversified midstream energy industry (which we refer to as the "Spectra Energy selected Canadian midstream companies"):

- AltaGas Ltd.
- Inter Pipeline Ltd.
- Keyera Corp.
- Pembina Pipeline Corporation
- TransCanada Corporation
- Veresen Inc.

Citi reviewed, among other information, enterprise values as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA. Financial data of the Spectra Energy selected Canadian midstream companies were based on publicly available Wall Street research analysts' consensus estimates, public filings and other publicly available information. Financial data of Western Canada was based on the Spectra Energy forecasts.

The overall low to high calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples observed for the Spectra Energy selected Canadian midstream companies were 12.9x to 17.3x (with a median of 14.5x), 12.1x to 13.8x (with a median of 13.3x) and 10.6x to 13.1x (with a median of 11.5x), respectively. Citi then applied selected ranges of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples derived from the Spectra Energy selected Canadian midstream companies of 12.9x to 17.3x, 12.1x to 13.8x and 10.6x to 13.1x, respectively, to corresponding data of Western Canada based on the Spectra Energy forecasts. This analysis indicated a selected approximate implied value reference range for Western Canada of $6.147 billion to $7.636 billion.

In evaluating Spectra Energy's 50% equity interest in DCP Midstream, Citi reviewed certain financial and stock market information, as applicable, relating to DCP Midstream and the following six selected companies that Citi considered generally relevant as publicly traded companies that are general partners of affiliated master limited partnerships with operations in the diversified midstream energy industry (which we refer to as the "Spectra Energy selected GP companies"):

- Energy Transfer Equity, L.P.
- EnLink Midstream, LLC
- NuStar GP Holdings, LLC
- ONEOK, Inc.
- The Williams Companies, Inc.
- Western Gas Equity Partners, LP

Citi reviewed, among other information, enterprise values as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated total cash flow of the Spectra Energy selected GP companies on an after-tax basis. Financial data of the Spectra Energy selected GP companies were based on publicly available Wall Street research analysts' consensus estimates, public filings and other publicly available information (with observed median multiples inclusive of publicly available Wall Street research analysts' consensus estimates for Spectra Energy). Financial data of DCP Midstream was based on the Spectra Energy forecasts. Financial data of Spectra Energy was based on publicly available Wall Street research analysts' consensus estimates and the Spectra Energy forecasts.

The overall low to high calendar year 2016, calendar year 2017 and calendar year 2018 estimated total cash flow multiples observed for the Spectra Energy selected GP companies were 11.7x to 20.4x (with a median of 14.8x), 11.6x to 18.9x (with a median of 14.5x) and 10.7x to 15.1x (with a median of 14.0x), respectively. Citi noted that the calendar year 2016, calendar year 2017 and calendar year 2018 estimated total cash flow multiples for Spectra Energy were 18.0x, 16.0x and 14.3x, respectively, based on publicly available Wall Street research analysts' consensus estimates. Citi then applied selected ranges of calendar year 2016, calendar year 2017 and calendar year 2018 estimated total cash flow multiples derived from the Spectra Energy selected GP companies of 11.7x to 14.8x, 11.6x to 14.5x and 10.7x to 14.0x, respectively, to corresponding data for DCP Midstream's distribution of total cash flow to Spectra Energy based on the Spectra Energy forecasts. This analysis indicated a selected approximate implied value reference range for Spectra Energy's 50% equity interest in DCP Midstream of $1.134 billion to $1.443 billion.

In evaluating Spectra Energy's GP/IDRs in Spectra Energy Partners, Citi reviewed certain financial and stock market information relating to Spectra Energy Partners and the Spectra Energy selected GP companies. Citi reviewed, among other information, GP values, calculated as enterprise values less the value of assets other than GP/IDRs, as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated GP/IDR cash flow on an after-tax basis. Financial data of the Spectra Energy selected GP companies were based on publicly available Wall Street research analysts' consensus estimates, public filings and other publicly available information (with observed median multiples inclusive of publicly available Wall Street research analysts'

consensus estimates for Spectra Energy). Financial data of Spectra Energy Partners was based on the Spectra Energy forecasts. Financial data of Spectra Energy was based on publicly available Wall Street research analysts' consensus estimates and the Spectra Energy forecasts.

The overall low to high calendar year 2016, calendar year 2017 and calendar year 2018 estimated GP/IDR cash flow multiples observed for the Spectra Energy selected GP companies were 11.8x to 23.7x (with a median of 16.7x), 11.4x to 29.1x (with a median of 16.7x) and 10.8x to 26.1x (with a median of 15.5x), respectively. Citi noted that the calendar year 2016, calendar year 2017 and calendar year 2018 estimated GP/IDR cash flow multiples for Spectra Energy were 30.5x, 24.1x and 20.1x, respectively, based on publicly available Wall Street research analysts' consensus estimates. Citi then applied selected ranges of calendar year 2016, calendar year 2017, calendar year 2018 estimated GP/IDR cash flow multiples derived from the Spectra Energy selected GP companies of 16.7x to 30.5x, 16.7x to 29.1x and 15.5x to 26.1x, respectively, to corresponding data for Spectra Energy Partners' distribution of GP/IDR cash flow to Spectra Energy based on the Spectra Energy forecasts. This analysis indicated a selected approximate implied value reference range for Spectra Energy's GP/IDRs in Spectra Energy Partners of $5.698 billion to $9.914 billion.

In evaluating the SEP common units owned by Spectra Energy, Citi reviewed certain financial and stock market information relating to Spectra Energy Partners and the following nine selected companies that Citi considered generally relevant as publicly traded companies with operations in the diversified midstream energy industry (which we refer to as the "Spectra Energy selected diversified midstream companies"):

- Kinder Morgan, Inc.

- Energy Transfer Partners, L.P.

- Enterprise Products Partners L.P.

- Magellan Midstream Partners, L.P.

- MPLX LP

- ONEOK Partners, L.P.

- Plains All American Pipeline, L.P.

- Sunoco Logistics Partners L.P.

- Williams Partners L.P.

Citi reviewed, among other information, enterprise values as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA and stock or unit prices on September 2, 2016 as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated after-tax distributable cash flow per share or unit. Citi also reviewed calendar year 2016, calendar year 2017 and calendar year 2018 estimated distribution yields. Financial data of the Spectra Energy selected diversified midstream companies were based on publicly available Wall Street research analysts' consensus estimates, public filings and other publicly available information (with observed median multiples and distribution yields inclusive of publicly available Wall Street research analysts' consensus estimates for Spectra Energy Partners and observed low and median distribution yields exclusive of Kinder Morgan, Inc. and The Williams Companies, Inc.). Financial data of Spectra Energy Partners was based on publicly available Wall Street research analysts' consensus estimates and the Spectra Energy forecasts.

The overall low to high calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples, estimated distributable cash flow per share or unit multiples and estimated distribution yields observed for the Spectra Energy selected diversified midstream companies were as follows:

- calendar year 2016 estimated EBITDA multiple: 12.3x to 18.6x (with a median of 14.7x)

- calendar year 2017 estimated EBITDA multiple: 11.7x to 15.3x (with a median of 13.3x)

- calendar year 2018 estimated EBITDA multiple: 9.8x to 13.9x (with a median of 12.1x)

- calendar year 2016 estimated distributable cash flow per share or unit multiple: 10.9x to 17.7x (with a median of 12.7x)

- calendar year 2017 estimated distributable cash flow per share or unit multiple: 9.8x to 16.1x (with a median of 12.4x)

- calendar year 2018 estimated distributable cash flow per share or unit multiple: 9.2x to 14.6x (with a median of 11.5x)

- calendar year 2016 estimated distribution yields: 4.7% to 10.3% (with a median of 6.7%)

- calendar year 2017 estimated distribution yields: 5.1% to 10.3% (with a median of 7.4%)

- calendar year 2018 estimated distribution yields: 5.5% to 10.3% (with a median of 7.7%)

Citi noted that the calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples for Spectra Energy Partners were 16.0x, 13.7x and 12.9x, respectively, the calendar year 2016, calendar year 2017 and calendar year 2018 estimated distributable cash flow per unit multiples for Spectra Energy Partners were 15.1x, 13.9x and 12.9x, respectively, and the calendar year 2016, calendar year 2017 and calendar year 2018 estimated distribution yields for Spectra Energy Partners were 5.9%, 6.3% and 6.8%, respectively, in each case based on publicly available Wall Street research analysts' consensus estimates. Citi then applied the following selected ranges of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples, estimated distributable cash flow per share or unit multiples and estimated distribution yields derived from the Spectra Energy selected diversified midstream companies to corresponding data of Spectra Energy Partners based on the Spectra Energy forecasts:

- calendar year 2016 estimated EBITDA multiple: 14.7x to 18.6x

- calendar year 2017 estimated EBITDA multiple: 13.3x to 15.3x

- calendar year 2018 estimated EBITDA multiple: 12.1x to 13.9x

- calendar year 2016 estimated distributable cash flow per share or unit multiple: 12.7x to 17.7x

- calendar year 2017 estimated distributable cash flow per share or unit multiple: 12.4x to 16.1x

- calendar year 2018 estimated distributable cash flow per share or unit multiple: 11.5x to 14.6x

- calendar year 2016 estimated distribution yields: 6.7% to 4.7%

- calendar year 2017 estimated distribution yields: 7.4% to 5.1%

- calendar year 2018 estimated distribution yields: 7.7% to 5.5%

This analysis indicated an approximate implied value reference range for the SEP common units owned by Spectra Energy of $9.162 billion to $12.216 billion.

The analyses described above of Union Gas, Western Canada, Spectra Energy's 50% equity interest in DCP Midstream, Spectra Energy's GP/IDRs in Spectra Energy Partners and the SEP common units owned by Spectra Energy indicated a selected approximate implied overall per share equity value reference range for Spectra Energy of $27.50 to $41.75.

In its selected public companies analysis of Enbridge on a consolidated basis, Citi reviewed certain financial and stock market information relating to Enbridge and the following eight selected companies that Citi considered generally relevant as publicly traded companies that directly or indirectly through affiliates own diversified midstream energy operations (which we refer to as the "Enbridge selected midstream companies"):

- Energy Transfer Equity, L.P.

- Enterprise Products Partners L.P.

- Kinder Morgan, Inc.
- ONEOK, Inc.
- Plains All American Pipeline, L.P.
- Spectra Energy Corp
- The Williams Companies, Inc.
- TransCanada Corporation

Citi reviewed, among other information, enterprise values as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA and stock or unit prices on September 2, 2016 as a multiple of calendar year 2016, calendar year 2017 and calendar year 2018 estimated after-tax cash available for dividends per share or unit. Citi also reviewed calendar year 2016, calendar year 2017 and calendar year 2018 estimated dividend yields. Financial data of the Enbridge selected midstream companies were based on publicly available Wall Street research analysts' consensus estimates, public filings and other publicly available information (with observed median multiples and dividend yields inclusive of publicly available Wall Street research analysts' consensus estimates for Enbridge and observed low and median dividend yields exclusive of Kinder Morgan, Inc. and The Williams Companies, Inc.). Financial data of Enbridge was based on publicly available Wall Street research analysts' consensus estimates and the Enbridge forecasts.

The overall low to high calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples, estimated cash available for dividends per share or unit multiples and estimated dividend yields observed for the Enbridge selected midstream companies were as follows:

- calendar year 2016 estimated EBITDA multiple: 12.3x to 15.3x (with a median of 14.5x)
- calendar year 2017 estimated EBITDA multiple: 12.0x to 13.9x (with a median of 13.1x)
- calendar year 2018 estimated EBITDA multiple: 10.8x to 12.8x (with a median of 12.0x)
- calendar year 2016 estimated cash available for dividends per share or unit multiple: 10.9x to 18.5x (with a median of 13.0x)
- calendar year 2017 estimated cash available for dividends per share or unit multiple: 10.1x to 16.1x (with a median of 12.2x)
- calendar year 2018 estimated cash available for dividends per share or unit multiple: 9.3x to 17.0x (with a median of 11.4x)
- calendar year 2016 estimated dividend yields: 3.8% to 7.7% (with a median of 5.1%)
- calendar year 2017 estimated dividend yields: 4.2% to 7.7% (with a median of 5.1%)
- calendar year 2018 estimated dividend yields: 4.6% to 7.7% (with a median of 5.3%)

Citi noted that the calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples for Enbridge were 15.6x, 14.4x and 13.7x, respectively, the calendar year 2016, calendar year 2017 and calendar year 2018 estimated cash available for dividends per share multiples for Enbridge were 13.2x, 12.2x and 11.6x, respectively, and the calendar year 2016, calendar year 2017 and calendar year 2018 estimated dividend yields for Enbridge were 4.0%, 4.5% and 4.9%, respectively, in each case based on publicly available Wall Street research analysts' consensus estimates. Citi then applied the following selected ranges of calendar year 2016, calendar year 2017 and calendar year 2018 estimated EBITDA multiples, estimated cash available for dividends per share multiples and estimated dividend yields derived from the Enbridge selected midstream companies to corresponding data of Enbridge based on the Enbridge forecasts:

- calendar year 2016 estimated EBITDA multiple: 14.5x to 15.6x
- calendar year 2017 estimated EBITDA multiple: 13.1x to 14.4x

- calendar year 2018 estimated EBITDA multiple: 12.0x to 13.7x
- calendar year 2016 estimated cash available for dividends per share multiple: 13.0x to 18.5x
- calendar year 2017 estimated cash available for dividends per share multiple: 12.2x to 16.1x
- calendar year 2018 estimated cash available for dividends per share multiple: 11.4x to 17.0x
- calendar year 2016 estimated dividend yields: 5.1% to 3.8%
- calendar year 2017 estimated dividend yields: 5.1% to 4.2%
- calendar year 2018 estimated dividend yields: 5.3% to 4.6%

This analysis indicated an average selected approximate implied per share equity value reference range for Enbridge of $37.75 to $49.25.

Utilizing the approximate implied per share equity value reference ranges derived for Spectra Energy, both on a consolidated and sum-of-the-parts basis, and the approximate implied per share equity value reference range derived for Enbridge on a consolidated basis, in each case as described above, Citi calculated the following implied exchange ratio reference ranges, as compared to the exchange ratio:

Implied Exchange Ratio Reference Ranges:

| Spectra Energy Consolidated | Spectra Energy Sum-of-the-Parts | Exchange Ratio |
|---|---|---|
| 0.660x – 1.086x | 0.558x – 1.106x | 0.984x |

For purposes of this analysis, Union Square analyzed the following statistics for each of the selected comparable companies:

- The enterprise value divided by estimated revenue for calendar year 2016, which is referred to below as Enterprise Value/2016E Revenue; and

- The enterprise value divided by estimated revenue for calendar year 2017, which is referred to below as Enterprise Value/2017E Revenue.

The following table summarizes the mean and median Enterprise Value/Revenue multiples of the selected group of comparable public companies:

| Selected Comparable Public Company Trading Statistics | Mean | Median |
|---|---|---|
| Enterprise Value/2016E Revenue | 3.0x | 2.8x |
| Enterprise Value/2017E Revenue | 2.7x | 2.6x |

Based on the analysis of the relevant metrics for each of the selected comparable companies and upon the application of its professional judgment and expertise, Union Square selected representative ranges of financial multiples and applied these ranges of financial multiples to the relevant financial statistic for Interactive Intelligence.

Based on the number of outstanding shares of Interactive Intelligence common stock on a fully diluted basis (including outstanding options and RSUs) as of July 31, 2016, Union Square calculated the estimated implied value per share of our common stock as follows:

| Financial Statistic | Selected Comparable Companies Representative Multiple Range | Implied Value Per Share of Interactive Intelligence Common Stock |
|---|---|---|
| Enterprise Value/2016E Revenue (Management Case) | 2.0x – 3.0x | $38.48 – $56.12 |
| Enterprise Value/2017E Revenue (Management Case) | 1.75x – 2.75x | $36.90 – $56.17 |
| Enterprise Value/2016E Revenue (Wall Street Case) | 2.0x – 3.0x | $38.46 – $56.10 |
| Enterprise Value/2017E Revenue (Wall Street Case) | 1.75x – 2.75x | $37.50 – $57.11 |

Union Square noted that the consideration to be received by holders of shares of Interactive Intelligence common stock (other than excluded shares) pursuant to the merger agreement was $60.50 per share.

No company utilized in the comparable public company trading analysis is identical to Interactive Intelligence. In evaluating the selected comparable companies, Union Square made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond the control of Interactive Intelligence, such as the impact of competition on Interactive Intelligence's businesses and the industry generally, industry growth and the absence of any adverse material change in Interactive Intelligence's financial condition and prospects or the industry or in the financial markets in general. Mathematical analysis (such as determining the average or median) is not in itself a meaningful method of using comparable company data.

90.     The omission of the information identified above renders this section of the Registration Statement materially misleading because shareholders have no way of determining whether the selected range of multiples applied by Citigroup have a valid basis and are reasonable in light of the fact they fall outside the range of multiples (or outside the median range) for the comparable companies.

91.     Further, the Registration Statement fails to disclose material information concerning Citigroup's *Discounted Cash Flow Analysis*. Specifically, the Registration Statement fails to disclose: (i) the definition of "unlevered free cash flow" ("UFCF") utilized by Citigroup in this analysis; (ii) the definition of "total cash flows" utilized by Citigroup in this analysis; (iii) the definition of "cash flows" utilized by Citigroup in its analysis of the GP/IDRs segment of Spectra; (iv) the definition of "distributable free cash flow" utilized by Citigroup in its analysis

of the SEP common units segment as well as the "cash taxes" analysis for Spectra; and (v) the individual inputs and assumptions utilized by Citigroup to derive the following discount rate ranges: (a) 6.9% - 8.7% for Enbridge, (b) 6.8% - 8.5% for Spectra, (c) 7.0% - 8.0% for Spectra's Western Canada segment, (d) 6.5% - 9.1% for Spectra's SEP common units segment, and (e) 8.2% - 9.9% for Spectra's DCP Midstream and GP/IDRs segments; (vi) the implied perpetuity growth rate range, for both Enbridge, Spectra and Spectra's individual operating segments, resulting from these analyses; and (vii) the net debt utilized by Citigroup for each of the analyses performed.

92.     The omission of this information renders the following information misleading:

(a)     On page 76-77 of the Registration Statement, the following:

*Discounted Cash Flow Analyses.* Citi performed separate discounted cash flow analyses of Spectra Energy both on a consolidated basis and on a sum-of-the-parts basis and Enbridge on a consolidated basis.

Citi performed a discounted cash flow analysis of Spectra Energy on a consolidated basis by calculating the estimated present value of the dividends per share that Spectra Energy was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019 based on the Spectra Energy forecasts. Citi calculated implied terminal values for Spectra Energy by applying to Spectra Energy's calendar year 2019 estimated dividends per share a selected range of dividend yields of 5.1% to 4.2%. The present values (as of January 1, 2017) of dividends per share and terminal values were then calculated using a selected range of discount rates of 6.8% to 8.5%. This analysis indicated a selected approximate implied per share equity value reference range for Spectra Energy of $36.50 to $45.25.

Citi also performed a discounted cash flow analysis of Spectra Energy on a consolidated basis by calculating the estimated present value of the cash available for dividends that Spectra Energy was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019 based on the Spectra Energy forecasts. Citi calculated implied terminal values for Spectra Energy by applying to Spectra Energy's calendar year 2019 estimated cash available for dividends per share a selected range of cash available for dividends per share multiples of 12.2x to 16.1x. The present values (as of January 1, 2017) of cash available for dividends per share and terminal values were then calculated using a selected range of discount rates of 6.8% to 8.5%. This analysis indicated a selected approximate implied per share equity value reference range for Spectra Energy of $29.00 to $38.00.

In addition, Citi performed a sum-of-the-parts discounted cash flow analysis of Spectra Energy to observe an approximate implied overall per share equity value reference range for Spectra Energy based on approximate implied values of Union Gas, Western Canada, Spectra Energy's 50% equity interest in DCP Midstream, Spectra Energy's GP/IDRs in Spectra Energy Partners and the SEP common units owned by Spectra Energy, adjusted for Spectra Energy's cash taxes expected to be paid after taking into account its tax attribute utilization.

Citi performed a discounted cash flow analysis of Union Gas by calculating the estimated present value of the unlevered free cash flows that Union Gas was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019 based on the Spectra Energy forecasts. Citi calculated implied terminal values for Union Gas by applying to Spectra Energy's Union Gas calendar year 2019 estimated EBITDA (taking into account certain growth and other capital expenditures) a selected range of terminal value EBITDA multiples of 10.6x to 12.2x. The present values (as of January 1, 2017) of cash flows and terminal values were then calculated using a selected range of discount rates of 5.2% to 5.8%. This analysis indicated an approximate implied value reference range for Union Gas of $5.629 billion to $6.502 billion.

Citi performed a discounted cash flow analysis of Western Canada by calculating the estimated present value of the unlevered free cash flows that Western Gas was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019 based on the Spectra Energy forecasts. Citi calculated implied terminal values for Western Canada by applying to Spectra Energy's Western Canada calendar year 2019 estimated EBITDA (taking into account certain growth and other capital expenditures) a selected range of terminal value EBITDA multiples of 12.1x to 13.8x. The present values (as of January 1, 2017) of cash flows and terminal values were then calculated using a selected range of discount rates of 7.0% to 8.0%. This analysis indicated an approximate implied value reference range for Western Canada of $6.159 billion to $7.128 billion.

Citi performed a discounted cash flow analysis of Spectra Energy's 50% equity interest in DCP Midstream by calculating the estimated present value of the total cash flows that such interest in DCP Midstream was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019 based on the Spectra Energy forecasts. Citi calculated implied terminal values for such interest in DCP Midstream by applying to calendar year 2019 estimated total cash flows to Spectra Energy from DCP Midstream a selected range of total cash flow multiples of 11.6x to 14.5x. The present values (as of January 1, 2017) of total cash flows and terminal values were then calculated using a selected range of discount rates of 8.2% to 9.9%. This analysis indicated an approximate implied value reference range for Spectra Energy's 50% equity interest in DCP Midstream of $1.446 billion to $1.789 billion.

Citi performed a discounted cash flow analysis of Spectra Energy's GP/IDRs in Spectra Energy Partners by calculating the estimated present value of the GP/IDR cash flows that Spectra Energy Partners was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019 based on the Spectra Energy forecasts. Citi calculated implied terminal values for such GP/IDRs by applying to calendar year 2019 estimated GP/IDR cash flows to Spectra Energy from Spectra Energy Partners a selected range of GP/IDR cash flow multiples of 16.7x to 29.1x. The present values (as of January 1, 2017) of GP/IDR cash flows and terminal values were then calculated using a selected range of discount rates of 8.2% to 9.9%. This analysis indicated an approximate implied value reference range for Spectra Energy's GP/IDRs in Spectra Energy Partners of $7.634 billion to $13.023 billion.

Citi performed a discounted cash flow analysis of the SEP common units owned by Spectra Energy by calculating the estimated present value of the distributable cash flow per unit that Spectra Energy Partners was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019, multiplied by the number of SEP common units owned by Spectra Energy, based on the Spectra Energy forecasts. Citi calculated implied terminal values for such SEP common units by applying to calendar year 2019 estimated distributable cash flow per unit from such SEP common units a selected range of distributable cash flow multiples of 12.4x to 16.1x. The present values (as of January 1, 2017) of distributable cash flow per unit and terminal values were then calculated using a selected range of discount rates of 6.5% to 9.1%. This analysis indicated an approximate implied value reference range for the SEP common units owned by Spectra Energy of $9.699 billion to $12.782 billion.

Citi performed a discounted cash flow analysis of Spectra Energy's cash taxes by calculating the estimated present value of such cash taxes, taking into account its expected tax attribute utilization, during the calendar

years ending December 31, 2017 through December 31, 2019 based on the Spectra Energy forecasts. Citi calculated implied terminal values for such cash taxes by applying to Spectra Energy's calendar year 2019 estimated cash taxes a selected range of terminal value EBITDA multiples of 12.2x to 16.1x. The present values (as of January 1, 2017) of cash taxes and terminal values were then calculated using a selected range of discount rates of 6.8% to 8.5%. This analysis indicated an approximate implied value reference range for Spectra Energy's cash taxes of ($2.570) billion to ($3.479) billion.

The analyses described above of Union Gas, Western Canada, Spectra Energy's 50% equity interest in DCP Midstream, Spectra Energy Partners, the SEP common units owned by Spectra Energy and Spectra Energy's GP/IDRs in Spectra Energy Partners, the SEP common units owned by Spectra Energy and Spectra Energy's cash taxes expected to be paid after taking into account its tax attribute utilization indicated a selected approximate implied overall per share equity value reference range for Spectra Energy of $28.00 to $42.00, as compared to the closing price of Spectra Energy common stock on September 2, 2016 of $36.15 per share.

Citi performed a discounted cash flow analysis of Enbridge on a consolidated basis by calculating the estimated present value of the dividends per share that Enbridge was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019 based on the Enbridge forecasts. Citi calculated implied terminal values for Enbridge by applying to Enbridge's calendar year 2019 estimated dividends per share a selected range of dividend yields of 5.1% to 4.2%. The present values (as of January 1, 2017) of the dividends per share and terminal values were then calculated using a selected range of discount rates of 6.9% to 8.7%. This analysis indicated a selected approximate implied per share equity value reference range for Enbridge of $39.00 to $48.75.

Citi also performed a discounted cash flow analysis of Enbridge on a consolidated basis based on cash available for dividends per share multiples by calculating the estimated present value of the cash available for dividends that Enbridge was expected to generate during the calendar years ending December 31, 2017 through December 31, 2019 based on the Enbridge forecasts. Citi calculated implied terminal values for Enbridge by applying to Enbridge's calendar year 2019 estimated cash available for dividends per share a selected range of cash available for dividends per share multiples of 12.2x to 16.1x. The present values (as of January 1, 2017) of the cash available for dividends per share and terminal values were then calculated using a selected range of discount rates of 6.9% to 8.7%. This analysis indicated a selected approximate implied per share equity value reference range for Enbridge of $50.00 to $65.75.

Utilizing the approximate implied per share equity value reference range derived for Spectra Energy, both on a consolidated and sum-of-the-parts basis, and the approximate implied per share equity value reference range derived for Enbridge, in each case as described above, Citi calculated the following implied exchange ratio reference ranges, as compared to the exchange ratio:

| Implied Exchange Ratio Reference Ranges: | | | |
| --- | --- | --- | --- |
| Consolidated (Dividend Yields) | Consolidated (Cash Available for Dividends) | Spectra Energy Sum-of-the Parts (Enbridge Dividend Yields) | Exchange Ratio |
| 0.749x – 1.160x | 0.441x – 0.760x | 0.574x – 1.077x | 0.984x |

93.    These statements are rendered false and/or misleading by the omissions identified above for a variety of reasons.  First, the definition of UFCF, total cash flows, cash flows, and distributable free cash flows can impact the valuation resulting from a DCF analysis.  Second, the individual multiples and assumptions utilized by Citigroup could have a meaningful impact on the conclusions presented in its DCF Analysis.  Third, it is well established that (i) the calculation of a discount rate requires the application of a number of objective inputs and assumptions; and (ii) the ultimate discount rate selected often has the single largest impact on a

resulting DCF valuation.  Accordingly, it is important that Spectra shareholders be provided insight into the reasonableness of Citigroup's discretionary use of the inputs and assumptions underlying the selected discount rate range.

94.     Lastly, the Registration Statement fails to disclose whether either BMOCM or Citigroup performed a precedent transactions analysis on either Spectra or Enbridge.

***Disclosures Relating to the Flawed Sales Process Leading Up to the Proposed Transaction***

95.     Lastly, the Registration Statements fails to provide the Company's shareholder with material information and/or provides materially misleading information regarding the sales process leading to the Proposed Transaction.  Specifically, the Registration Statement fails to disclose: (i) the reasoning behind the Board's failure to conduct a market check or to contact any other party who might be interested in a strategic transaction with the Company; (ii) why the Board was insistent on an all-stock transaction; (iii) whether the Board considered a transaction that involved cash or part cash-and-stock component; and (iv) the role the continued membership on the Board of Defendant Ebel and four additional members of the Spectra Board played in the Board's determination to enter into the Proposed Transaction with Enbridge.

96.     As a result of the Individual Defendants' violations of the federal securities laws, Plaintiff and the Class will suffer irreparable injury and will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction.  Unless enjoined by this Court, the Individual Defendants will continue to violate the federal securities laws, and may consummate the Proposed Transaction, to the irreparable harm of the Class.  Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

98.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

99.     During the relevant period, Defendants disseminated the false and misleading Registration Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

100.    By virtue of their positions within the Company, Defendants were aware of this information and of their duty to disclose this information in the Registration Statement.  The Registration Statement was prepared, reviewed, and/or disseminated by Defendants. The Registration Statement misrepresented and/or omitted material facts, as detailed above. Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.  Defendants have also failed to correct the Registration Statement,

and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

101.    The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the Registration Statement.  In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Registration Statement and in other information reasonably available to stockholders.

102.    By reason of the foregoing, the Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

103.    Unless the Defendants are enjoined by the Court, they will continue to violate the law, to the irreparable harm of the members of the Class.

104.    Because of the false and misleading statements in the Registration Statement, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.  Therefore, injunctive relief is appropriate to ensure the Defendants' misconduct is corrected

### COUNT II
**Violation of Section 20(a) of the Exchange Act**
**(Against All Individual Defendants)**

105.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

106.    Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of" the Exchange Act or any of the rules promulgated thereunder.  Such "controlling persons" are "liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled

person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

107.    By reason of the allegations herein, Defendants violated §14(a) of the Exchange Act by issuing and publishing the Registration Statement, which contained untrue statements of material fact concerning the Proposed Transaction, and omitted material facts concerning the Proposed Transaction necessary in order to make the statements in the Registration Statement not misleading.

108.    The Individual Defendants were controlling persons of Spectra within the meaning of §20(a) of the Exchange Act.

109.    The Individual Defendants, by virtue of their positions as officers and/or directors of Spectra, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs, and therefore exercised general control over the operations of Spectra.

110.    The Individual Defendants, by virtue of their positions as officers and/or directors of Spectra, had the power or ability to control the issuance, publication, and contents of the Registration Statement.   The Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered concerning the Proposed Transaction.

111.    The Individual Defendants, by virtue of their positions as officers and/or directors of Spectra, had the ability to prevent the issuance of the materially misleading Registration Statement or to cause the Registration Statement to be corrected so that it was not in violation of §14(a) of the Exchange Act.

112.    By virtue of the foregoing, the Individual Defendants violated §20(a) of the Exchange Act, and Plaintiff is entitled to relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief in her favor and in favor of the Class and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative;

B.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain an agreement providing fair and reasonable terms and consideration to Plaintiff and the Class;

C.    Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

DATED: October 10, 2016.

Respectfully submitted,

_____/s/ Thomas E. Bilek_____
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX 77002
(713) 227-7720

*Attorneys for Plaintiff*

**OF COUNSEL:**

Shane T. Rowley
**LEVI & KORSINSKY, LLP**
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500
Fax: (212) 682-3010